UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:21-CR-13-GFVT-HAI-8 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| EVA MISRA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Defendant Eva Misra was working at the Express Health Care ("EHC") addiction-recovery clinic in Harriman, Tennessee when law enforcement executed a search warrant on December 13, 2018. After officers secured the scene, two agents interviewed Misra in a counseling room for about an hour and 38 minutes. Misra has moved to suppress her statements during that interview on the basis her *Miranda* rights were violated and her statements were coerced. Having conducted an evidentiary hearing and fully considered the record, the undersigned recommends that the motion be denied.

This case involves the multi-year investigation of a multi-site clinic ("Express Health Care" or "EHC") on suspicions of pill diversion and accompanying fraud. The underlying facts have been outlined in prior orders. *See, e.g.*, D.E. 391, 392. Eleven defendants are charged with a total of twenty-seven counts, including money laundering, health care and wire fraud, conspiracy to unlawfully distribute controlled substances, falsification of medical records, and various conspiracies. D.E. 1. These charges arise from allegedly unlawful practices at EHC. *Id*. at 6. Defendant Taylor founded EHC and all but two of his co-defendants were EHC employees. *Id*. at 6-7. This is one of several defensive motions filed by the medical-provider defendants in this

1

matter.

On June 7, 2022, Misra filed her "Motion to Suppress Statement," with an investigative report (DEA-6) attached. D.E. 254. The government responded in opposition. D.E. 296. Misra replied. D.E. 313. On September 14, 2022, the Court conducted an evidentiary hearing. D.E. 395. The Court heard testimony from the agent in charge of the search and the two officers who interviewed Misra. D.E. 400. Misra took the stand to testify, but there was a dispute concerning the scope of permissible cross examination and the extent to which her testimony at the suppression hearing could be used at trial. The hearing was continued, the parties submitted briefs on the legal issues (D.E. 421, 422), and the Court followed up with a teleconference (D.E. 446). The hearing was reconvened on October 25, 2022. After extensive advice from the Court and opportunity to consult with counsel, Misra testified. D.E. 474, 475. Misra filed a post-hearing brief. D.E. 487. And the government filed a post-hearing brief, twice. D.E. 488, 489.

Transcripts of the hearing are filed in the record. D.E. 418 (September 14), 419 (sealed bench conference), 476 (October 25).

The first question is whether Misra was in custody during her interview at the clinic, such that *Miranda* warnings should have been given. The second question is whether her statements were involuntarily coerced. The answer to both is no.

### I.  The Recording

The interview, conducted by DEA Investigator Armstrong and Special Agent Haines, was recorded. The one hour, 38-minute recording is filed in the record. D.E. 308. A few aspects of the interview have received particular attention from the parties in fashioning their arguments. After the recording starts, the agents enter the room and introduce themselves to Misra. SA Haines makes the following introductory remarks. The transcriptions are the Court's own from the

recording.

| | |
|---|---|
| Haines: | We'd like to talk to you if you're willing to talk to us regarding your employment here at Express Health Care. |
| Misra: | Okay.  May I ask what's happening? |
| Haines: | Sure . . . We are executing a federal search warrant on the Express Health Care business today, so that authorizes us seize certain documents, records. During that process we just typically try to interview staff and employees and patients of the clinic so we can get a better idea and understanding of what the day-to-day operations of the clinic are.  So, having said that, would you, is it okay to talk to you to answer some questions?  If you don't want to, you don't have to. |
| Misra: | Okay. |
| Haines: | You are free to leave at any time. |
| Misra: | Okay. |
| Haines: | Also, if we ask you a question that you don't want to answer, you don't have to answer it. |
| Misra: | Yeah, I can answer some questions.  And then if I don't feel comfortable maybe I could do it that way.  Is that okay? |
| Haines: | Yeah. |
| Misra: | I don't really know what's going on.  I've worked here for four years.  I'm part time.  I work two days a week.  And so, yeah, since I'm not involved in the ownership of the clinic or anything like that . . . . I'm technically just a contractor. . . . |

Recording at 1:24 to 2:39.  Shortly after that, Investigator Armstrong asks some preliminary

questions, a couple of which Misra declines to answer:

| | |
|---|---|
| Armstrong: | What's your date of birth? |
| Misra: | I'm not comfortable answering that, is that okay? |
| Armstrong: | Alright.  Where do you live at? |
| Misra: | I live in Knoxville. |

3

> Armstrong:    A certain address?  Are you comfortable providing that?
>
> Misra:    I'd rather not provide that.
>
> Armstrong:    Alright, alright.

Recording at 4:14 to 4:42.  Misra then provides her phone number, and the substantive interview commences.  The recording captures what sounds to be a relaxed conversation, free from any threats, outbursts, or conflict.  Misra is talkative, providing free-ranging answers to questions. After nearly an hour, SA Haines asks:

> Haines:    We've kind of talked about a lot of the questions that they wanted us to ask. We've covered a lot of it.
>
> Misra:    Yeah, that's fine.  Yeah, I'll try to help as much as I can.  I want everything to be out in the open so you understand what we do.

Recording at 54:09 to 54:24.

A half-hour later, close to the end of the session, the interviewers step out twice and there are exchanges with Misra about calling her husband:

> Haines:    Do you mind giving us a just a second?  We'll step out and then we'll come back in.  We're almost done, okay.
>
> Misra:    Okay.  Do you care if I make a phone call?  I was just going to call my husband.  Would you rather me not?
>
> Haines:    Yeah, I think hold off on that for just a second, okay.  We'll be back [indecipherable].  Thank you.

Recording at 1:35:00 to 1:35:16.  The agents soon return.  SA Haines says,

> Haines:    We're about done.  Do you need to use the restroom or get a cup of coffee or a drink or anything?
>
> Misra:    Um, if we'll be finished soon, I can do it.

Recording at 1:36:00 to 1:36:11.  They briefly discuss the iPad and the room they are in.  Misra explains it is a counseling room where patients watch an educational video on the iPad and fill out

forms, not a room where doctors see patients.  SA Haines then says, "Don't use your phone for just a second and we'll be right back."  The recording ends less than two minutes after the exchange quoted above concerning a restroom/coffee break.

## II.  Evidence at the Hearing

### A.  Detective Emit Thompson

The first witness was Detective John "Emit" Thompson of the Kentucky Attorney General's Office.  Det. Thompson serves in the "drug investigation branch" and is also a DEA task force officer.  He testified that he had been assigned to lead the December 13, 2018 search of the Harriman EHC clinic, which was one of five locations searched that day.  He testified the December 13 search date was selected because the "covert" side of the investigation was coming to a close.  And officers expected fewer patients there in the second week of the month.

Det. Thompson testified that the officers involved in the five searches had a meeting at a hotel the night before to provide instructions to the different search teams.  The plan was to not arrest anyone that day.  Agents hoped to interview staff, but they were not going to tell any person they were "required to give an interview."  D.E. 418 at 53.

Det. Thompson said the search began when officers made a "soft entry" into the front door of the clinic.  D.E. 418 at 13-14.  Although they had their weapons drawn, the officers who entered did not breach the door or make everyone lie on the ground.  *Id*.  He said there were five or six officers on the initial entry team.  *Id*. at 20.  They would have worn tactical gear and shouted "police, search warrant," as they went inside.  *Id*. at 21.  Det. Thompson went into the "reception area," and the officers told everyone inside (staff and patients) to go to the "waiting room for patients" while the clinic was secured.  *Id*. at 22.  He said it would be standard to frisk people as this was done.  *Id*.

5

Det. Thompson remembered disabling the clinic's video system or asking another officer to do it. He testified this is done to avoid revealing tactics, exposing officers who work undercover, and endangering the officers during the search—particularly because surveillance videos can often be viewed remotely, as was true of EHC's system. D.E. 418 at 40-42.

At some point, Det. Thompson or another officer opened the back door of the clinic from the inside to let in other officers from behind the clinic (which is part of a strip mall). He testified that about fifteen federal-connected officers and an unknown number of Tennessee Highway Patrol officers were involved in the EHC Harriman search—roughly twenty in all. D.E. 418 at 32. Some of these officers remained outside to maintain the "perimeter." *Id*. at 32, 37-40.

As for Misra herself, Det. Thompson testified he expected to find physicians at the clinic, but he did not know Misra specifically would be there. He testified Misra was "a target of the investigation." D.E. 418 at 7. Det. Thompson knew before the search that his team would expend several hours to mirror the hard drives in the clinic and that, if possible, any physicians present would be interviewed. Thompson knew ahead of time that Mark Armstrong and Richard Haines had been assigned to interview clinic staff. They had been given a script for conducting any physician's interview. He testified they did not single Misra out for an interview; she was treated the same as other EHC employees that day. *Id*. at 56.

Det. Thompson could not remember any *Miranda* warnings being given to anyone at the clinic. He testified that once the "initial security sweep" was done, the people "were no longer detained." D.E. 418 at 54. Det. Thompson did not know who said what to the people in the waiting area. He does not know if anyone told them they were free to leave.

## B. Investigator Mark Armstrong

The second witness, Mark Allen Armstrong II, testified that at the time of the EHC search

6

he was a diversion investigator with the DEA, specializing in controlled pharmaceuticals going into the illicit market. He testified he is not a law enforcement officer. He does not make arrests and does not carry a weapon. As a diversion investigator he would regularly participate in searches and often conducted interviews at searches.

Inv. Armstrong testified that his involvement in this case began the evening before the search with the pre-search briefing at the hotel. He met Det. Thompson that night and thinks he met Richard Haines the following morning. All he recalled about his assignment was that he expected to interview people at the search scene. D.E. 418 at 65-66. Inv. Armstrong testified he was given a script of questions for EHC employees. *Id*. at 68. He knew he was going to an opioid-dependence treatment facility. He had previously interviewed "a lot of" physicians involved in medication-assisted addiction treatment. D.E. 418 at 78.

Inv. Armstrong testified that he entered the front doors of the clinic along with the computer forensic people after the entry team secured the premises. He did not know whether the staff and patients were told they were free to leave. But he knew that, per the pre-raid briefing, the plan was that they would be allowed to leave once the clinic was secured.

As for Misra, Inv. Armstrong did not remember if he or someone else escorted her to the room where she was interviewed. D.E. 418 at 76. He thought Misra had previously been identified to him as one of the suboxone-provider physicians at EHC. He testified he gave Misra no *Miranda* warnings because he did not consider her to be in custody. *Id*. at 70. He did not know whether Misra was a specific target of the investigation. To him, "It was just a routine interview of someone who was interviewed voluntarily." *Id*. at 79. He did not recall even thinking about whether to give *Miranda* warnings. "We just made a conscious decision to let her know that she did not have to speak with us and that she was free to not answer questions." *Id*. at 80. Inv. Armstrong testified

he never raised his voice when interviewing Misra. He never threatened her and used no tactics to trick or deceive her. *Id*. at 97-98.

As for Misra's cellphone, Inv. Armstrong testified they had no plan to separate interviewees from their phones. They knew Misra had one, but it did not concern them. D.E. 418 at 81. No one tried to take it from her. *Id*. at 99. Inv. Armstrong agreed Misra had the right to use her phone. When asked about his request to Misra that she delay making a call, Inv. Armstrong testified:

> [T]he reason why that occurred was because we knew at that point the interview was just about over . . . just minutes from being done. [We] didn't want to get into a situation where, you know, if she decided to call her husband where she felt like she kind of had to hang—we were just kind of like—kind of speed her along because we knew this interview was exactly over—or almost over, and we kind of just wanted to get it done and send her on her way, I guess.

D.E. 418 at 82. Inv. Armstrong testified that "just a few minutes" prior they told Misra they were "wrapping up the interview." Misra asked to make a call, and they "just asked her to wait a little bit." *Id*. at 83-84. Inv. Armstrong testified he did not think this exchange would cause Misra to feel she was not free to leave because Misra "had to understand we truly were at the end of the interview, that it was just a matter of minutes away." *Id*. at 85.

The investigators left to discuss the interview and returned a few minutes later with only two more questions—what sort of room they were in and something about the iPad that was in it. The interviewers then left a second time and asked Misra to hold off on making a call. Inv. Armstrong testified that "in this situation, her request came within the last three minutes of the interview. Like the second time Mr. Haines told her to hang on, whatever. We released her right after that. I don't think we asked her any more questions." D.E. 418 at 87. He testified that if Misra's request had come more in the middle of the interview, he would "absolutely" have allowed her to make the call. *Id*. at 87-88. He said,

8

in this circumstance, we were just about ready to be finished with the interview, and then she truly would have been free to call without us around or anything, you know, without worrying about whether or not we had additional questions or anything because she would have been completely done with the interview.

*Id.*at 88-89.

### C. Special Agent Haines

The third witness was Richard Harrison Haines.  At the time of Misra's interview, Haines was a special agent with the Health and Human Services Office of the Inspector General.  In that position, he specialized in investigating fraud, waste, and abuse related to Medicare and Medicaid. He was not involved in the EHC investigation prior to the search warrant executions.  He was brought in from Nashville to help, and he attended the briefing the night before the searches.  He was assigned to conduct interviews and was given a list of questions to ask.  He did not recall any discussion of *Miranda* warnings at the briefing.

SA Haines testified he thought he was part of the entry team but was not certain.  Misra was his only interview subject that day.  He did not recall who took her to the interview room or anything that was said to her other than what is on the recording.  D.E. 418 at 111.  The interview room was "pretty open," without many containers to search.  *Id.*  SA Haines recalled that Misra sat closest to the door, between the interviewers and the door.  SA Haines recorded the interview. Misra was not told she was being recorded; SA Haines did not think there was a reason to tell her that.  SA Haines did not consider Misra to be in custody.

SA Haines agreed that Misra had the right to make a phone call.  He told her to "hold off" on calling her husband because:

> I thought we were done with the interview, and I was trying to let her go on about the rest of her day.  I thought we had concluded.  I just wanted to double-check with Mark for a quick second.  It turned out—I don't remember which of us, but we had a question apparently relating to an iPad that was—that was in the room, and I think that was the final question that we asked, and that concluded the

interview.

       So I thought we were getting ready to tell her, you know, that we had—to thank her for her time and that we had asked all the questions that we wanted to ask her and that we were done.

D.E. 418 at 144. He further explained, "I just thought she would be more comfortable talking to her husband outside the presence of agents; so I was just trying to get her on her way to do what she wanted to do." *Id*. at 129. SA Haines acknowledged that, after the interviewers stepped out the first time, he asked Misra if she wanted to take a break. "I realized that we had been conducting the interview for over an hour, and I just thought I would ask if she needed to take a break," even though he did not think the interview would last much longer. *Id*. at 130.

Concerning the tone of the interview, SA Haines testified:

> it was a very, for lack of a better term, benign interview, very cordial. I don't recall Dr. Misra exhibiting signs of nervousness or anything like that. She was very nice, pleasant. I thought she kind of, you know, laughed a time or two during the interview, as I heard it, and it was a pleasant—I thought it was a pleasant interview to have conducted.

*Id*. at 126.

### D. Dr. Eva Misra

Finally, Defendant Misra testified at the reconvened hearing on October 25. After earning a Bachelor's in anthropology from the University of Tennessee, Misra obtained her medical degree in the Dominican Republic in 1999. She then did an internal medicine residency at the University of Tennessee until 2004. After her residency, Misra worked for the state of Tennessee as a disability evaluator. She did not treat patients; she evaluated them for Social Security disability purposes. She began treating patients when she joined EHC in March or April of 2014. Misra worked at both EHC locations. Initially, she was more often at Jacksboro, but since 2016 she worked mostly at Harriman. At first, she worked three days a week for EHC, but in 2018 she was

usually at the clinic two days a week. She testified she was familiar with the "back part" of the Harriman EHC clinic where the doctors worked. D.E. 476 at 58-59.

Misra testified that employees park behind the Harriman clinic and enter through a back door with a combination-code lock. Next to that back door is an office room with computers where the doctors review their patient charts for the day. On the morning of December 13, 2018, when the search began, Misra was at a computer reviewing charts. She suddenly saw a man holding a gun who wore what appeared to be a Tennessee Highway Patrol ("State Trooper's") uniform. D.E. 476 at 41. He told Misra and the other two employees in the room, "hands up, don't move." *Id.* at 33. Misra did not see the officer come inside the building, but she "felt" that he had come in through the back door. *Id.* at 61.

This officer directed Misra and the other employees to the lobby/waiting area at the front of the clinic. Misra testified eight to ten people were kept there—two were patients, the rest were employees. The number of officers involved seemed to her at least as large as the number of people kept in the waiting room. Misra remembered watching an officer removing the clinic's security cameras from the corners of the rooms. Seeing the cameras removed made her nervous; she did not understand what the officers did not want seen.

Misra testified she never heard anyone tell the patients and employees they were free to leave. D.E. 476 at 39. She did not see any of the patients and employees leave. The group was together in the waiting area for thirty to forty minutes before Misra was brought to another room for the interview.

Misra testified she was in the waiting room when the two interviewers came in, pointed at her, said "that's the doctor," and escorted her to another room. D.E. 476 at 40-41. Misra testified she did not select that room or lead the officers there; the interviewers did not seek her input. The

11

interview room was not a room familiar to Misra; she believed it was used for playing an informative video for patients on the iPad-type screen on the wall. One of the first rooms off the lobby, she considered it a "small" room. *Id.* at 42. She recalled it contained an exam table, a couple of chairs, and another table with the display screen mounted nearby. She testified that she sat across that table from the interviewers and the door was shut during her interview.

Misra testified she was not told she was being recorded. D.E. 476 at 44. She was not told that she was a target or a suspect. She recalled seeing a gun holster on one of the interviewers and assumed both officers were armed. The interviewers never touched her and never threatened her with arrest. They did not threaten any harm or reprisal for failure to participate. Although assets from two of her bank accounts were seized that day, Misra was not aware of this at the time of the interview.

Misra testified she was not told she could refuse to answer *all* their questions—that she could stop the interview and leave. D.E. 476 at 46. She did not dispute that the recording may have captured her being told she was free to leave. *Id.* at 66-69, 76-78. She testified that, under the circumstances, she would not have left the clinic without asking permission; she "respect[s] law enforcement." *Id.* at 46. She agreed that she declined to provide her home address and date of birth. She testified it is her practice not to share that information with strangers. But she did volunteer her phone number.

Misra testified her cellphone was in her possession during the interview. No one took it from her or asked to take it. She testified her husband was trying to call her and she wanted to answer the call because the search and interview were taking a long time and she was getting nervous. D.E. 476 at 48. She asked permission to use her phone because she did not feel free to use it otherwise.

Misra testified she did not understand at that time of the cellphone conversations that the interview was close to being over. Instead, she testified that when the interviewers offered her a bathroom break and a beverage, that sounded like the interview would be continuing. She did not recall being told that the interview was almost over or that it had been concluded. D.E. 476 at 50-51.

Misra testified that she ultimately asked the interviewers if she could leave. One of them told her it was okay. D.E. 476 at 51. Misra then went to the back office and retrieved her purse. It looked "ruffled through," like it had been searched. *Id.* at 54. She then went to her car, called her husband, and left to meet him.

Concerning the audio recording of her December 2018 interview, Misra testified she had never listened to it in its entirety. She acknowledged that the recording captures the interviewers telling her she did not have to answer questions and was free to leave, but she testified she did not remember hearing those statements. Misra testified that, throughout the search and the interview, she never felt she was free to leave and did not feel like she could completely terminate the interview. Instead, she thought she only had the option to decline to answer individual questions. D.E. 476 at 46-47, 66-69, 76-78.

### E.  Factual Findings

Few material facts are in dispute, particularly because the interview itself was captured on the recording. One dispute concerns the following statement from the motion to suppress: "At about 9:30 a.m., the keypad-controlled back door to the facility—very near the back office where Dr. Misra was working—flew open. Unknown persons charged through the door yelling 'hands up, hands up.'" D.E. 254-1 at 4. On this point, the Court accepts the testimony of Det Thompson. D.E. 418 at 37-38, 52. The entire entry team came through the front door. And it was not until

13

the clinic was secured that the back door was opened from the inside to admit officers from the back of the building. Misra testified that she "felt" or "assumed" that the State Trooper who took her to the waiting area came in through the back door. She therefore had no direct knowledge of those events. The Court finds Misra was simply mistaken on whether the Trooper who found her entered through the back. In any event, whether officers came through the back door is not particularly relevant to the custody/voluntariness analysis. Executions of search warrants often begin with a startling show of force. Yet courts routinely find that interviews conducted after the site is secured are non-custodial. There is no dispute that multiple officers entered the building, guns drawn and speaking loudly, and herded the clinic occupants to the waiting area.

The Court accepts Misra's testimony that she did not choose the interview room. She was escorted there by Inv. Armstrong and SA Haines with no input of her own. Neither Armstrong nor Haines remembered anything about who chose the room, who took Misra there, or what was said in the process of moving her location. But Misra testified she clearly remembered her interviewers pointing at her, saying "that's the doctor," and escorting her to another room.

All four witnesses were generally credible, but all were hampered by diminished memory of events that happened almost four years ago. The officers often relied on their recent review of the recording for their testimony, and they readily deferred to the recording. Misra testified she subjectively believed she was not free to leave. She also testified she either did not hear or did not understand SA Haines statements that she could leave and did not have to participate:

| Haines: | **We'd like to talk to you if you're willing to talk to us** about your employment here at Express Health Care. . . . We are executing a federal search warrant . . . . having said that . . . **is it okay to talk to you to answer some questions? If you don't want to, you don't have to.** |
|---|---|
| Misra: | Okay. |
| Haines: | **You are free to leave at any time.** |

14

Misra:          Okay.

Recording at 1:24 to 2:39 (emphasis added).  Despite her testimony, the recording reflects simple, easily understandable concepts that she unequivocally acknowledged.  Although Misra comes across as a straight-shooter, the Court cannot ignore that she has reason to testify that she did not feel free to leave.  Her subjective impressions of the events cannot be weighty in the Court's analysis.

### III.  Custody and *Miranda*

### A.  Legal Standards for *Miranda* Violation

The first of two issues is whether Misra was subject to custodial interrogation without being read her *Miranda* rights.  The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has held that certain warnings, such as the right to the presence of an attorney, to remain silent, and that any statement made may be used against the Defendant in a criminal trial, must be given before any custodial interrogation.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  Thus, the *Miranda* doctrine sets forth rules of police procedure applicable to "custodial interrogation." *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977).

Here, the interviewers did not inform Misra of her *Miranda* rights.  And there is no evidence suggesting she was given *Miranda* warnings by anyone else.

However, to avail herself of the *Miranda* doctrine, Misra must show she was subject to custody *and* interrogation prior to making the incriminating statements.

"[F]or the *Miranda* doctrine to apply, *both* custody and interrogation must exist."  *United States v. Magana*, 70 F. App'x 859, 863 (6th Cir. 2003).  "Custody" and "interrogation" are terms of art under *Miranda*.  Interrogation includes "any words or actions on the part of the police . . .

that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Woods*, 711 F.3d 737, 740-41 (6th Cir. 2013). There is no dispute that Misra was subject to interrogation. Instead, this case turns on whether Misra was in custody. There is no dispute that Mirsa was not placed under formal arrest.

The initial burden of establishing "custody" rests on the movant. *United States v. Lawrence*, 892 F.2d 80 (6th Cir. 1989). The term "custody" is meant to capture "circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508-09 (2012). "Custody" exists when, in light of the objective circumstances, (1) a reasonable person would have felt not at liberty to terminate the interaction and leave and (2) the interview exhibited "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* at 509.

> In determining whether someone is "in custody" for purposes of *Miranda*, courts focus on "the objective circumstances of the interrogation" and "how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action." [*United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009)] (citation omitted). "The ultimate inquiry is whether, under the totality of the circumstances, the interviewee's freedom of movement was restrained to a degree associated with formal arrest." *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (citing *Panak*, 552 F.3d at 465). We have identified four, non-exhaustive factors to help guide this inquiry: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010).

*United States v. Zabel*, 35 F.4th 493, 502 (6th Cir. 2022).

"[E]ven if a reasonable person would have felt their movement was restrained, the additional question must be asked if 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *United States v. Couch*, No. 6:13-CR-03-GFVT, 2013 WL 6095512, at *9 (E.D. Ky. Nov. 20,

2013) (quoting *Fields*, 565 U.S. at 509). "Even if a reasonable person in a suspect's position would not have felt free to leave, the suspect is not in custody unless 'the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *United States v. Howard*, 815 F. App'x 69, 79 (6th Cir. 2020) (quoting *Fields*, 565 U.S. at 509). "The ultimate question is 'whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*.'" *United States v. Martinez*, 795 F. App'x 367, 370-71 (6th Cir. 2019) (quoting *Fields*, 565 U.S. at 509); *see also United States v. Edrington*, 851 F. App'x 574, 576 (6th Cir. 2021); *United States v. Ramamoorthy*, 949 F.3d 955, 964 (6th Cir. 2020).

What are the inherently coercive pressures resembling the type of station house questioning at issue in *Miranda*? The *Miranda* Court began by decrying old practices of "sustained and protracted questioning incommunicado" and "physical brutality and violence" in order to "extort confessions." *Miranda*, 384 U.S. at 446. The Court then stressed that "that the modern practice of in-custody interrogation is psychologically rather than physically oriented." *Id.* at 48. The Court then quoted at length from interrogation manuals and offered this summary:

> In essence, it is this: To be alone with the subject is essential to prevent distraction and to deprive him of any outside support. The aura of confidence in his guilt undermines his will to resist. He merely confirms the preconceived story the police seek to have him describe. Patience and persistence, at times relentless questioning, are employed. To obtain a confession, the interrogator must 'patiently maneuver himself or his quarry into a position from which the desired objective may be attained.' When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice. It is important to keep the subject off balance, for example, by trading on his insecurity about himself or his surroundings. The police then persuade, trick, or cajole him out of exercising his constitutional rights.

*Id.* at 455. Such procedures can " even give rise to a false confession." *Id.* at 455 n.24.

17

## B.  Analysis

Misra subjectively felt some restraint on her freedom, but the objective totality of circumstances do not indicate she was subject to the equivalent of formal arrest or faced "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."

## 1.  Location of the Interview

First, the location of the interview weighs against a finding of custody.  The recent *Zabel* case (cited by Defendant, D.E. 313 at 3) is instructive.  There, a national park employee was interviewed by park rangers at Mammoth Cave, where the defendant had worked for over six months.  The Sixth Circuit explained:

> We have noted that "police questioning taking place in the suspect's . . . place of work is likely to be less intimidating than questioning taking place at the police station," *United States v. Protsman*, 74 F. App'x 529, 533 n.6 (6th Cir. 2003), where the goal is to "isolat[e] the suspect in unfamiliar surroundings 'for no purpose other than to subjugate the individual to the will of his examiner,'" *Beckwith v. United States*, 425 U.S. 341, 346 n.7 (1976) (quoting *Miranda*, 384 U.S. at 457). That the interview took place at Zabel's jobsite weighs against him being "in custody."  *See United States v. Crossley*, 224 F.3d 847, 861-62 (6th Cir. 2000); *United States v. Mahan*, 190 F.3d 416, 421-22 (6th Cir. 1999).

*United States v. Zabel*, 35 F.4th 493, 502 (6th Cir. 2022).  Here, that the interview occurred at Misra's jobsite weighs against a finding of custody.

Misra argues that she only worked at the Harriman EHC clinic two days a week; "it was not her personal medical office."  D.E. 313 at 4.  That fact may somewhat diminish the anti-custodial weight of this factor, but it does not transform this factor into one that weighs *in favor of* a finding of custody.  The EHC clinic was still a place familiar to Misra.  As she explained in the recording, she had worked there as a physician for four years.  She testified at the hearing that she was very familiar only with "the back" part of the office.  This fact also diminishes somewhat the anti-custodial weight of this factor, but again the location factor does not tip to pro-custody.

18

Misra also points out that even one's home can become a coercive environment under certain circumstances. D.E. 313 at 4. As the *Panak* Court noted, even "an inherently comfortable and familiar environment" can be made "unduly hostile, coercive, and freedom-restraining," depending on the number of officers, the show of authority, the conspicuous display of drawn weapons, and the nature of the questioning. *United States v. Panak*, 552 F.3d 462, 466 (6th Cir. 2009). The hearing testimony revealed that the clinic was initially entered by six officers with their weapons drawn. They corralled the staff and patients into the waiting room while they made a sweep to secure the facility. Staff and patients would have been frisked, including checking any purses for weapons. After the initial sweep, the officers' weapons were holstered, and other officers and agents entered. As many as fifteen federally connected agents were involved, as well as Tennessee Highway Patrol Officers who came and went throughout the day, many of whom stayed in the parking lot. D.E. 418 at 32.

Undoubtedly, this initial entry was an impressive show of force. But Misra's interview began over half an hour after the entry. A reasonable person would conclude in the interim that the initial show of force was intended to help secure the scene, not restrain anyone in particular for questioning. The *location* was not an inherently intimidating place like a stationhouse interrogation room. *United States v. Salvo*, 133 F.3d 943, 951 (6th Cir. 1998). This first factor weighs against a finding of custody.

## 2. Length and Manner of Questioning.

As to the second factor, while the length of the interview weighs slightly in favor of a finding of custody, the "manner of the questioning" does not. *United States v. Zabel*, 35 F.4th 493, 502 (6th Cir. 2022).

Here, the interview was relatively long—an hour and 38 minutes. This is only a few

minutes longer than the 90-minute interview found non-custodial in *Mahan*. *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (observing the interview "lasted only an hour and a half"). The government points to cases where interviews as long as two hours were found to be non-custodial. D.E. 296 at 9. The non-custodial interview in *Tummins* lasted two hours, but the Sixth Circuit never states whether that length weighed in favor or, or against, a finding of custody. Instead, the Court focused more intently on the fact that the interview was conducted in the defendant's home with no significant show of force by the officers. *United States v. Tummins*, 517 F. App'x 342 (6th Cir. 2013). The interview in *Gillman* lasted eighty minutes, and the Court remarked that it has found interviews up to ninety minutes to be non-custodial. The Court does not say that a length of eighty minutes weighs *against* a finding of custody. *United States v. Gillman*, 432 F. App'x 513 (6th Cir. 2011). The Court in *Martinez* agreed with the district court that "that the length of the interview (eighty minutes) was not itself problematic." *United States v. Martinez*, 795 F. App'x 367, 374 (6th Cir. 2019). The First Circuit in *Hughes* remarked that a ninety-minute interview was "relatively short." *United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011). The District Court in *Eaton* found that when an interview lasted from 45 to 90 minutes, its length "favors a finding of non-custody." *United States v. Eaton*, 954 F. Supp. 2d 646, 650 (W.D. Mich. 2013). And other cases state plainly that an interview length of two hours weighs in favor of custody. *See, e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004); *United States v. Holt*, 751 F. App'x 820, 824 (6th Cir. 2018) ("The length of Holt's interview—approximately two hours—supports his argument that he was in custody."). Thus, case law seems to have settled on 90 minutes or less as weighing against custody, while two hours or more weighs in favor of custody. Misra's 98-minute interview falls in the chasm of ambiguity between these two benchmarks.

20

The raw length of the interview (98 minutes)—considered in isolation as a factor to be analyzed—weighs somewhat in favor of custody. *See United States v. Mahmood*, 415 F. Supp. 2d 13, 18 (D. Mass. 2006) (finding a 95-minute interrogation "significant in length")

However, Misra was notably talkative throughout the entire interview. This was not a case where agents struggled to extract information. There is no indication that agents lengthened the interview to enhance its coercive effect. Misra was eager to tell her story and explain the inner workings of EHC. It was Misra's own enthusiastic participation that lengthened the interview. Given Misra's robust participation, while the length of the interview tips in favor of custody, it does so to only a minor degree.

The "manner of questioning," however, was not at all indicative of custody. The agents explained at the beginning that they were not "case agents" who were familiar with the investigation; they had simply been given questions to ask. As the agents read the prepared questions, Misra generally responded with thorough narrative answers. And she declined to respond to the questions asking her birthdate and address. The manner of questioning by no means indicates custody. As in *Panak*,

> the officers did not attempt to use any incriminating information *against* [Misra] to leverage their authority over her: They never told [Misra] she was in trouble, never told her she was a possible suspect, never asked her any accusatory questions, never told her she was potentially subject to criminal penalties and never reminded her of any information they may have gathered against her[.]

*United States v. Panak*, 552 F.3d 462, 469 (6th Cir. 2009). "In this case, the tone of the conversation remained calm and noncombative;" it was by no means so "relentless" or "accusatory" that it would feel like a *Miranda*-style stationhouse interrogation. *United States v. Martinez*, 795 F. App'x 367, 374 (6th Cir. 2019). The "'consensual' tone and tenor of the meeting weighs against a finding of custody." *United States v. Edrington*, 851 F. App'x 574, 577 (6th Cir.

21

2021).

This factor ultimately weighs against custody. Although the length of the interview tips slightly toward custody, the manner of questioning was strongly non-custodial.

### 3. Restraint on Freedom of Movement

The next factor looks to restraint on freedom of movement. In *Zabel*, the defendant argued he was in custody because the rangers moved him to a different location away from his coworkers for the interview. The appellate Court found this was a sort of restriction of his movement. *United States v. Zabel*, 35 F.4th 493, 503 (6th Cir. 2022). Misra similarly was taken to a separate room not of her own choosing. But the *Zabel* Court also emphasized that Zabel was never handcuffed, nor was there any show of force, such as brandishing a firearm or handcuffs or other restraint equipment. *Id.* (citing *Mahan*, 190 F.3d at 422). In the same way, the fact that Misra was taken to a separate room for interviewing purposes does not tip this factor in favor of custody. This factor usually tips in favor of custody when there are handcuffs or other direct physical restraints. *See United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009).

Misra argues that her inability to use her cellphone shows her freedom was restrained. D.E. 313 at 6. She points to cases indicating that freedom to make and receive calls is indicative of non-custody. *Id.* at 6-7. But a small restraint of freedom of movement, such as being asked to wait a few minutes to make a call, does not weigh very heavily in favor of a finding in custody.

The *Zabel* case contains an illustrative circumstance which is more extreme than the cellphone issue here. Zabel asked his interviewers if he could use the restroom, and they did not immediately allow it. "You're going to have to hold it for a few minutes," the rangers told him, knowing that the nearest restroom was some distance away. *Zabel*, 35 F.4th at 499. Zabel asked to use a nearby bucket instead, but that request was also denied. The Court observed, "After being

22

twice denied the ability to use the restroom, it is entirely possible that a reasonable person in Zabel's position may have felt temporarily restrained in their freedom of movement." *Id*. at 503. Nevertheless, Zabel's interview was still found to be noncustodial under the circumstances.

Here, about three minutes before the interview concluded, Misra asked to use her phone. Twice, the interviewers told her to hold off (though she was invited to go to the restroom if she needed to). Misra's uninterrupted possession of her phone tends to indicate non-custody. But the Court agrees that unfettered phone use tends to indicate lack of custody. The fact that Misra's phone use was temporarily restrained does weigh somewhat in favor of custody.

Nevertheless, the testimony of Misra's interviewers includes a reasonable explanation for why they asked her to delay making a call. Both interviewers acknowledged that Misra had the right to use her phone. But both said they thought the interview was almost over, and they had indicated to Misra that they were almost done. As memorialized in the recording,

| Haines: | Do you mind giving us a just a second? We'll step out and then we'll come back in. We're almost done, okay. |
| Misra: | Okay. Do you care if I make a phone call? I was just going to call my husband. Would you rather me not? |
| Haines: | Yeah, I think hold off on that for just a second, okay. We'll be back [indecipherable[1]]. Thank you. |

Recording at 1:35:00 to 1:35:16. The agents soon return. SA Haines says,

| Haines: | We're about done. Do you need to use the restroom or get a cup of coffee or a drink or anything? |
| Misra: | Um, if we'll be finished soon, I can do it. |

Recording at 1:36:00 to 1:36:11. The recording confirms that only a couple more questions were

---

[1] The government suggests SA Haines here said, "I think we're wrapping up." D.E. 489 at 6. This is consistent with Det. Armstrong's testimony. D.E. 418 at 83 ("I think just a few minutes before that we told her that we were wrapping up the interview."). But the Court finds this short segment of the recording indecipherable.

23

asked after this point.  SA Haines then says, "Don't use your phone for just a second and we'll be right back."  The recoding ends soon thereafter.  And Misra testified she then asked to leave and was granted permission.  For their part, the interviewers testified they believed Misra would prefer to call her husband after the interview was concluded.  Given the full circumstances, the issue with the telephone weighs very, very slightly in favor of custody.[2]  There was some restraint on Misra's freedom, but the interviewers credibly testified they had a reasonable explanation for asking Misra to delay calling her husband.

Finally, as the government points out, the single time Misra asked permission to leave, permission to depart was immediately granted.  D.E. 489 at 5.  There is simply no evidence that, following the security sweep, any officer did anything to prevent Misra from leaving if she chose to.

Misra argues there was no "clear moment of transition" between her detention during the security sweep and her subsequent interview.  D.E. 487 at 13.  When there is a clear transition from detention to non-detention, such as the removal of handcuffs, that fact can become relevant to the restraint-of-movement factor.  *See United States v. Barnett*, No. 6:21-CR-13-GFVT-HAI-2, 2022 WL 1498106, at *6 (E.D. Ky. May 11, 2022).  Misra argues her case is like codefendant Barnett's, who was escorted downstairs for her interview following a four-hour wait.  *See id*; D.E. 487 at 13.  But really her case is more like codefendant Grenkoski's, although Misra did not select her interview room.  *See* D.E. 487 at 13 (quoting D.E. 470 at 20).  To the extent a "transition" is a component important to the restraint-of-movement factor, there was a transition here when the

---

[2] Misra further argues that the fact that she asked permission to use her phone shows she did not subjectively believe she possessed full freedom of movement during the interview.  D.E. 313 at 7.  Misra did ask, "Do you care if I make a phone call," but this does not move the needle toward custody.  The test is objective and looks to the circumstances external to the defendant.  The "subjective views harbored by either the interrogating officers or the person being questioned" are not relevant.  *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004).  Asking before making a call may be more indicative of politeness than of custody.

interviewers told Misra they would like to talk if she was "willing," but that she did not "have to" if she did not "want to" and that she was "free to leave at any time," as captured in the recording. Misra was clearly not free to leave during the security sweep, but she was told, upon entering the interview room, that the situation had changed. She was told at that point that she *was* free to leave.

The Court's conclusions herein are based upon the individualized and particular circumstances of Misra's interview in light of the *Panak* factors. In other words, the conclusions herein stand on their own and are not dependent upon the analyses of similar motions by Misra's codefendants.

In sum, although Misra was moved to a relatively small windowless room away from the other clinic occupants, and although she was asked not to use her phone near the end of the interview, the restraint-of-movement factor, under the totality of the circumstances, does not weigh in favor of custody.

### 4. Not Required to Answer Questions

The most important factor here, as in *Zabel*, is the fourth, "whether the individual was told that he or she did not need to answer the questions." The *Zabel* Court explained:

> No one factor is dispositive, but "[w]hether investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important consideration in the *Miranda* custody analysis." *United States v. Martinez*, 795 F. App'x 367, 371 (6th Cir. 2019) (citing *Howes v. Fields*, 565 U.S. 499, 515 (2012)). In fact, we have held that when law enforcement officers provide clear assurances that a person is free to leave or terminate questioning, those assurances "likely would . . . guarantee[ ] the noncustodial nature" of the interview. *See* [*United States v. Panak*, 552 F.3d 462, 468 (6th Cir. 2009)].

*United States v. Zabel*, 35 F.4th 493, 503 (6th Cir. 2022). Here, the interview began with the following exchange:

Haines:      We'd like to talk to you **if you're willing to talk to us** about your

employment here at Express Health Care.

| | |
|---|---|
| Misra: | Okay.  May I ask what's happening? |
| Haines: | Sure . . .  We are executing a federal search warrant . . . .  During that process we typically try to interview staff and employees and patients of the clinic so we can get a better idea and understanding of what the day-to-day operations of the clinic are.  So, having said that, would you, **is it okay to talk to you to answer some questions?  If you don't want to, you don't have to.** |
| Misra: | Okay. |
| Haines: | **You are free to leave at any time.** |
| Misra: | Okay. |
| Haines: | Also, if we ask you a question that you don't want to answer, **you don't have to answer it.** |
| Misra: | Yeah, I can answer some questions.  And then if I don't feel comfortable maybe I could do it that way.  Is that okay? |
| Haines: | Yeah. |

Recording at 1:24 to 2:39 (emphasis added).

Here, Misra was unambiguously informed at the outset that she was free to leave and did not have to answer questions.  A highly educated individual, she responded with acknowledgement.  She then demonstrated she understood these statements by actually declining to answer a couple of questions.  Given the importance the Sixth Circuit has placed on this factor, it weighs very heavily against a finding that the interview was custodial.  In fact, this factor alone—that Misra was told she was free to leave and did not have to answer questions—in this case should result in a finding she was not in custody.

In her post-hearing brief, Misra emphasizes the formulation in *Panak* that the "question in the end is not whether the individual felt pressure to *speak* to the officers but whether she was forced to *stay* with them."  D.E. 487 at 2 (quoting *Panak*, 552 F.3d at 471).  This cherrypicked

formulation does not displace the need to evaluate the four factors addressed herein. Nor is this formulation helpful to Misra as she was unambiguously advised that she "was free to leave at any time" and the interview was conducted in a manner consistent with that assurance.

Misra argued prior to the hearing she was only given the assurances quoted above one time. D.E. 313 at 8. And she testified she only remembered being told she could refuse to answer individual questions. Assuming she truly has no recollection of being told she was free to decline the interview and to leave at any time, the Court chalks this up to diminished memory due to the passage of time. Misra was informed—only once—that she could decline the interview and/or leave at any time. But her interview involved no restraints, shouting, threats, or other factors indicative of coercion or custody. In this circumstance, being told once was enough to get the point across that Misa could stop answering questions and leave.[3] And there is no authority requiring law enforcement to repeat its assurances.

Misra argues she "was never told that she could stop the interview." D.E. 313 at 8. But the recording confirms she was told at the beginning of the interview, "You are free to leave at any time," which means she could stop the interview. Misra argues she was never told she was not under arrest. *Id*. But in the context of the interview, nothing suggested she was under arrest. Misra argues she was never told she had the right to speak to an attorney. *Id*. But this is part of the *Miranda* warnings. Given that Misra was not in custody, there was no need for the interviewers to provide *Miranda* warnings.[4]

_____

[3] Given what is memorialized in the recording, the Court rejects Misra's arguments that "Like Barnett, she was *not* told that 'she could stop her interview if she elected' (DE # 470 at 24), and unlike Grenkoski, she was never told that she 'did not have to submit to an interview at all.' *Id.*" D.E. 487 at 16. Misra was essentially told at the outset that the interview would occur if she was "willing." If she did not "want to" answer "some questions," she did not have to. And she was told she was "free to leave at any time." No reasonable person would doubt the meaning of that assurance. The defense's approach is hyper-technical.

[4] Misra points to Det. Thompson's "confess[ion]" that he "would have given *Miranda* warnings, and it's kind of a standard." D.E. 487 at 4, 15. In context, Det. Thompson is saying he remembers the plan was "if [clinic employees]

Considering the relevant factors, Misra's interview was not custodial as to trigger *Miranda*. She was not subject to "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Panak*, 552 F.3d at 471. Officers did make an initial showing of force upon entering and securing the clinic. However, after that initial burst of activity died down, a reasonable person in Misra's situation would have felt free to decline or terminate the interview and leave. This is particularly true for Misra, as the recording captured her being told that she was free to leave and did not have to answer questions. The Court's main focus is what occurred during the interview. *United States v. Swan*, 842 F.3d 28, 31 (1st Cir. 2016) ("[I]n conducting the *Miranda* analysis, we focus on the time that the relevant statements were made."); *United States v. Wallace*, 323 F.3d 1109, 1113 (8th Cir. 2003) ("Our main focus must be on the individual's restraint *during the interview*."). And here, the recording speaks for itself. Misra was expressly told she did not have to participate, could refuse any questions, and could "leave at any time." The interview was cordial and driven by Misra's own eagerness to tell her story and educate her interviewers about the clinic.[5] Misra has not met her burden of proving custody. Her statements given at the EHC clinic in December 2018 ought not be suppressed.

### IV. Voluntariness

### A. Legal Standards for Voluntariness

Due Process prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)). "When a

---

are willing to talk, interview them. If not, cut them loose." D.E. 418 at 33-34. Of course, Det. Thompson was not present in the interview itself, and his speculation on what he would have done given his own agency's standard procedures is not a factor to be considered in this analysis.

[5] Alternatively, *even if* a reasonable person in that situation would not have felt free to terminate the interview and leave, the circumstances were not so coercive and oppressive as to mimic the sort of station-house interrogation described in the *Miranda* opinion. *Howes v. Fields*, 565 U.S. 499, 508-09 (2012).

defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir. 1992)).

The Sixth Circuit has established three requirements to prove that a confession was involuntary: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).

"Coercive police activity is a necessary predicate to a finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 166 (1986). Courts must look to the totality of the circumstances to determine whether a defendant's will was overborne in a particular case. *Mahan*, 190 F.3d at 422. Relevant factors include the defendant's age, education and intelligence; whether the defendant has been informed of his constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. *Id.* at 422-23.

## B.  Analysis

On voluntariness, Misra's motion recites the governing law, then states, "Here, the police activity as described above was objectively coercive and sufficient to overbear Dr. Misra's will and was the motivating factor in her making the statements." D.E. 254 at 15. Her reply brief omits her involuntariness argument altogether. Misra's post-hearing brief argues that Misra's own testimony contributes "significantly" toward a finding of coercion. D.E. 487 at 19. "Her testimony

29

left no doubt that she did not feel free to leave and felt that she was required to stay and be interviewed, all as a result of the coercive police conduct." *Id.*

On the contrary, Misra's testimony identified no coercive police conduct. Further, her subjective feelings on the matter are not determinative. And she has a strong motivation to testify that she felt coerced. The facts relevant to custody are relevant here. Most importantly, Misra was told she did not have to answer questions and was free to leave. Misra did in fact decline to answer two questions early in the interview. The interviewers simply read questions in a normal tone of voice. There was no restraint, show of force, or threats. Misra was asked not to use her phone toward the end of the session. To the extent those requests concerning the telephone were coercive, they by no means retroactively render the interview involuntary. Misra was 49 years old at the time of the interview. She is an educated and intelligent physician. There was no physical oppression, and the interview was not extremely long. The objective circumstances were insufficient to overbear her will. The government has met its burden of proving voluntariness by the preponderance of the evidence.

## V.  Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendant Eva Misra's motion to suppress (D.E. 254) be **DENIED.** Misra was not "in custody." Nor were her statements involuntary.

The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal Procedure 59(b) concerning the right to appeal to the District Judge. Any objection must be filed within **fourteen days** of the entry of this order. Failure to object per Rule 59(b) waives a party's right to review. Upon expiration of that fourteen-day period, this matter will be submitted to Judge Van Tatenhove for

his consideration.

      This the 7th day of November, 2022.

Signed By:

*Hanly A. Ingram*

**United States Magistrate Judge**