UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 6:21-cr-00013-GFVT-HAI-8 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| EVA MISRA, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Magistrate Judge Ingram's Recommended Disposition on Defendant Eva Misra's Motion to Suppress.  [R. 495; R. 254.]  Two government agents interviewed Dr. Misra at her workplace after police executed a search warrant.  Dr. Misra moves to suppress her statements from that interview because the police violated her *Miranda* rights and her statements were involuntary.  [R. 254.]  Judge Ingram recommends denying the Motion, and Dr. Misra objects to Judge Ingram's Recommended Disposition.  [R. 495; R. 516.]  Because Dr. Misra was not in custody and voluntarily answered the agents' questions, the objection **[R. 516]** is **OVERRULED**, the Recommended Disposition **[R. 495]** is **ADOPTED** as and for the opinion of the Court, and the Motion to Suppress **[R. 254]** is **DENIED**.

**I**

On the morning of December 13, 2018, federal law enforcement and Tennessee Highway Patrol agents executed a search warrant at the Harriman location of EHC, a medical facility.  [R. 418 at 11.]  To execute the warrant, five or six police officers entered the front entrance of the EHC.  *Id.* at 14.  The officers entered with their weapons drawn, but they did not breach the front

door or make people inside lie on the ground.  *Id.* The officers testified that they likely would have worn tactical gear and shouted "police, search warrant," as they went inside.  *Id.* at 21.

Law enforcement's first goal was to conduct a security sweep of the clinic.  Police frisked for weapons anyone that they encountered and directed them to the clinic's waiting area until after they finished the sweep.  *Id.* at 22, 43.  At some point, officers also disabled the clinic's security cameras.  *Id.* at 40; [R. 476 at 37.]  After the security sweep, non-police personnel, like those conducting interviews and searching computers, would have started entering the clinic.  [R. 418 at 70-71.]

Law enforcement's next goal was to interview the clinic staff, if possible.  *Id.* at 26. Investigator Mark Armstrong and Agent Richard Haines were assigned to interview clinic staff, and they were given a list of questions to read when conducting interviews.  *Id.* at 78, 106.  Mark Armstrong was a diversion investigator who participated in searches.  *Id.* at 61.  As an investigator, Armstrong was not a law enforcement officer who could make arrests or carry a weapon.  *Id.* at 96.  Richard Haines was a special agent and carried a firearm.  *Id.* at 106.

In total, up to twenty personnel connected to law enforcement—federal law enforcement and Tennessee Highway Patrol—were present throughout the day.  *Id.* at 32.  Some agents present were not police officers who could carry a firearms, some law enforcement personnel entered the clinic for only part of the search, and some personnel never entered the clinic but kept watch outside the building.  *Id.* at 32, 51.

Dr. Misra worked at the clinic as a physician two to three days per week for four years. [R. 476 at 58-59.  When the search began, Dr. Misra was reading charts in the back of the office. *Id.* at 32.  Dr. Misra then saw a man holding a gun who wore a Tennessee Highway Patrol uniform and told her and the other employees, "hands up, don't move."  *Id.* at 33.  The trooper

escorted her to the front lobby, where she waited for thirty to forty-five minutes. *Id.* at 34, 40.

Dr. Misra testified that then, Investigator Armstrong and Agent Haines entered the room, pointed

at her and said, "that's the doctor," and escorted her to another room. *Id.* at 40.

They escorted Dr. Misra to an examination room that contained an examination table, a

couple of chairs, and another table. *Id.* at 43.  After entering the room, they closed the door. *Id.*

at 45.  Dr. Misra sat closest to the door and across the table from the agents. *Id.* at 44; [R. 418 at

111-12.]  The agents never told Dr. Misra that she was a suspect, target of the investigation, or

that police had seized assets from two of Dr. Misra's bank accounts.  [R. 476 at 45.]  They also

never gave Dr. Misra any *Miranda* warning.  [R. 418 at 70.]

The agents recorded the ensuing interview.  [R. 308.]  The recording reflects the

following introductory exchange:

> Agent Haines:  We'd like to talk to you if you're willing to talk to us regarding your
> employment here at Express Health Care.
>
> Dr. Misra:  Okay. May I ask what's happening?
>
> Agent Haines:  Sure . . . We are executing a federal search warrant . . . .  During that
> process we just typically try to interview staff and employees and patients
> of the clinic so we can get a better idea and understanding of what the day-
> to-day operations of the clinic are.  So, having said that, would you, is it
> okay to talk to you to answer some questions?  If you don't want to, you
> don't have to.
>
> Dr. Misra:  Okay.
>
> Agent Haines:  You are free to leave at any time.
>
> Dr. Misra:  Okay.
>
> Agent Haines:  Also, if we ask you a question that you don't want to answer, you don't
> have to answer it.
>
> Dr. Misra:  Yeah, I can answer some questions.  And then if I don't feel comfortable
> maybe I could do it that way.  Is that okay?

*Id.*  Shortly after this exchange, Investigator Armstrong asked Dr. Misra for her date of birth and address, and she declined to answer.  *Id.*

Near the end of the interview, Investigator Armstrong and Agent Haines told Dr. Misra that they were going to "step out and then we'll come back in" and that they were "almost done." *Id.*  At that point, Dr. Misra asked the agents: "Do you care if I make a phone call?" and "Would you rather me not?"  *Id.*  Agent Haines then responded: "I think hold off on that for just a second, okay." *Id.*  Dr. Misra testified that she was told again to not use her phone while they stepped out.  [R. 476 at 49.]

When Investigator Armstrong and Agent Haines returned, they asked if Dr. Misra would like to use the restroom or if she would like a drink.  *Id.* at 50.  Dr. Misra declined their offer.  *Id.* The agents asked a few more questions then indicated that they were stepping out of the room a second time.  *Id.*  Dr. Misra testified that they told her to "wait here."  *Id.* at 51.  Instead, she asked if she could leave, and they said that she could go.  *Id.*

Dr. Misra moves to suppress her statements to law enforcement during the interview at the clinic.  [R. 254.]  Magistrate Judge Ingram held an evidentiary hearing and recommends that the Court deny Dr. Misra's motion.  [R. 495.]  Dr. Misra objects.  [R. 516.]

## II

The Fifth Amendment provides that "[n]o person...shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V.  This requires police to advise a person of their rights under *Miranda v. Arizona* before a custodial interrogation and prohibits police from coercing a person into making certain statements.  384 U.S. 436 (1966); *see Miller v. Fenton*, 474 U.S. 104, 109 (1985).

In her motion to suppress, Dr. Misra argues that law enforcement violated the Fifth Amendment by conducting a custodial interview her without *Miranda* warnings and coercing her into making statements during the interview. [R. 254.] Judge Ingram found that Dr. Misra's arguments lack merit and recommends that the Court deny her motion. [R. 495.] First, Judge Ingram determined that Dr. Misra's statements are admissible under *Miranda* because Dr. Misra was not in custody when she made the statements. *Id.* at 28. Judge Ingram also found that the statements should not be suppressed because they were voluntary. *Id.* at 30. Dr. Misra objects to both determinations. [R. 516.]

When a criminal defendant objects to portions of a magistrate's recommended disposition, the Court reviews the proposed findings and recommendation objected to *de novo*. *See* 28 U.S.C. § 636(b)(1). *De novo* review here leads to the same determination reached by Judge Ingram. Consequently, Dr. Misra's objections are overruled.

## A

Dr. Misra objects to Judge Ingram's determination that she was not in custody when police questioned her. [R. 516 at 13.] She argues that her statements should be suppressed because police should have given her a *Miranda* warning before her custodial interrogation. *Id.*

To protect the right against self-incrimination, the rule established in *Miranda v. Arizona* requires law enforcement officers to give specific warnings before conducting a custodial interrogation. 384 U.S. at 444. However, the warnings are required only "when there has been such a restriction on a person's freedom as to render him 'in custody.'" *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The defendant carries the burden of establishing that she was in custody. *See United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986).

5

To determine whether a defendant was "in custody," courts consider the totality of the circumstances surrounding the encounter "with the ultimate inquiry turning on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)) (internal quotation marks omitted). This inquiry is objective, focusing on how "a reasonable person in the suspect's position would perceive his or her freedom to leave," rather than the suspect's actual mindset. *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011) (internal citations and quotation marks omitted).

The Sixth Circuit developed four factors to use when determining whether a person was in custody when questioned: (1) the location of the interview; (2) the length and manner of the questioning; (3) whether the person possessed unrestrained freedom of movement during the interview; and (4) whether the person was told that she did not need to answer the questions. *Panak*, 552 F.3d at 465. An analysis of these factors demonstrates that Dr. Misra was not in custody during her interview.

**1**

The location of the interview weighs against finding that Dr. Misra was in custody. A person in a more familiar environment feels more unrestrained to move about, speak as much or as little as they want, limit the scope of the interview, or ask the officers to leave. *Id.* at 466 (noting that a person would presumably feel most free in their home). For this reason, police questioning in a suspect's workplace "is likely to be less intimidating than questioning taking place at the police station," where the police might seek to isolate the individual in unfamiliar surroundings to exercise control over her. *United States v. Zabel*, 35 F.4th 493, 502 (6th Cir.

2022).  Accordingly, the Sixth Circuit has held that an interview that takes place at a suspect's jobsite "weighs against him being in custody." *Id.* (internal quotation omitted).

Police questioned Dr. Misra in an unlocked examination room at EHC's Harriman clinic, where Dr. Misra worked two to three days per week for four years.  [R. 476 at 58-59.]  However, Dr. Misra testified that she was familiar mostly with "the back part" of the office, and the examination room where police interviewed her was small: containing one or two chairs, an examination table, and another table.  *Id.* at 42-43.  While these characteristics diminish the weight of this factor, an exam room in Dr. Misra's longtime workplace stands in marked contrast to an "inherently intimidating" and unfamiliar police stationhouse in which a person might feel constrained or indicate that the person is in custody.  *Id.*; *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (holding that a person was not in custody when police interviewed him in an unlocked conference room at his workplace).

Dr. Misra argues that even if her workplace was a familiar environment, police transformed it into a custodial environment when executing the search warrant.  [R. 516 at 16.]  Indeed, a reasonable person's understanding of whether they are in custody can be impacted if the freedoms of their environment are removed, such as when the environment becomes "police dominated." *United States v. Craighead*, 539 F.3d 1073, 1084-85 (9th Cir. 2008).  Courts consider the "number of officers, the show of authority, the conspicuous display of drawn weapons, [and] the nature of the questioning" when determining whether police turned a familiar environment into a coercive and freedom-restraining one.  *Panak*, 552 F.3d at 466.

*Haque* is instructive for this inquiry.  *United States v. Haque*, 315 Fed. App'x 510, 519 (6th Cir. 2009).  In *Haque*, twelve agents executing a search warrant entered a home wearing raid jackets and with their weapons drawn.  *Id.*  "However, the weapons were holstered and the

raid clothing was removed once the house was secured." *Id.* The officer who interviewed the homeowner arrived later in plain clothes, asked if they could talk, and the suspect agreed. *Id.* "During the interview, [the suspect] was not handcuffed, his movement was not restricted, and nothing was recorded." *Id.* The Sixth Circuit agreed with the district court's judgment that the suspect was not in custody.

The police search here is similar. Five or six law enforcement officers entered the clinic with their weapons drawn to conduct a security sweep. [R. 418 at 21.] As police spread through the building, they would frisk the people they encountered for weapons and direct the people to the lobby area. *Id.* at 22. After the security sweep, officers holstered their weapons and other law enforcement personnel entered the clinic. *Id.* at 32, 124. When police sought to interview Dr. Misra, they asked if she was "willing to talk" and that she was "free to leave at any time." [R. 495 at 3.] Police never handcuffed or physically restrained Dr. Misra, and Agent Haines removed his tactical vest before the interview. *Id.* at 118. Up to twenty officers and agents were present throughout the day, but some never entered the clinic and others that later entered the clinic did not carry a weapon. *Id.* at 32, 51. While the circumstances of the initial entry and search may have been intimidating, they did not continue to the interview. Ultimately, the initial show of authority inherent in the security sweep is insufficient to make Dr. Misra's workplace analogous to an interrogation room during her interview, which was separated from the sweep by time, the agents holstering their weapons and removing tactical gear, and the agents asking Dr. Misra to talk.

**2**

The length and manner of Dr. Misra's questioning also weighs against custody. The interview lasted one hour and thirty-eight minutes. [R. 495 at 19; R. 516 at 17.] Generally,

length weighs against custody if the interview lasted about an hour and a half or less.  *See, e.g.*, *United States v. Martinez*, 795 F. App'x 367, 374 (6th Cir. 2019) ("[T]he length of the interview (eighty minutes) was not itself problematic"); *United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) (holding that a ninety-minute interview was "relatively short" and "consistent with the finding that the interview was not custodial").  On the other hand, interviews longer than two hours weigh in favor of finding custody.  *See, e.g.*, *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004).

Judge Ingram thus correctly observed that the length of the interview—ninety-eight minutes—likely weighs slightly in favor of custody.  [R. 495 at 21.]  Yet interview length is relevant to the custody inquiry because it helps determine whether the interviewee's freedom of movement was restrained to the degree of a formal arrest.  *See United States v. Holt*, 751 F. App'x 820, 823 (6th Cir. 2018).  Affirmative action on behalf of law enforcement is inherent in that determination.  But here, as Judge Ingram found, there is no indication that agents lengthened the interview to enhance its coercive effect.  [R. 495 at 21.]  The agents used a pre-written list of questions.  [R. 418 at 68.]  Dr. Misra's own enthusiastic participation and eagerness to tell her story lengthened the interview.  [R. 418 at 98; R. 495 at 21.]  Thus, while the length still weighs in favor of custody, it does so only slightly.

Judge Ingram also found that the manner of questioning indicated non-custody.  *Id.*  The Court agrees.  Nobody raised their voice during the interview, and the agents never threatened Dr. Misra.  [R. 476 at 72;] *see Martinez*, 795 F. App'x at 374 (rejecting a claim of custody when "the tone of the conversation remained calm and noncombative").  In fact, when Dr. Misra refused to answer a question the agents "just kept going" down their list.  *Id.*  Dr. Misra agreed that the agents "kept a fairly calm, friendly demeanor" and she was "friendly and polite back,"

even laughing a time or two.  [R. 418 at 125-26; R. 476 at 73;] *see United States v. Edrington*, 851 F. App'x 574, 577 (6th Cir. 2021) (noting that "the 'consensual' tone and tenor of the meeting weighs against a finding of custody").  This questioning is not analogous to stationhouse questioning.  Although the length of the interview weighs slightly toward a finding of custody, the manner of questioning weighs strongly against custody.  Accordingly, this factor weighs against custody.

Citing *Martinez*, Dr. Misra argues that the manner of questioning weighs in favor of custody because law enforcement neglected to inform her that she was a target of the investigation.  [R. 516 at 18.]  But *Martinez* held that misleading an interviewee is relevant in the custody analysis "only to the extent that it would make a reasonable person … feel compelled to remain and answer the agents' questions."  795 F. App'x at 373.  The police's ruse in *Martinez* weighed in favor of custody because the defendant "felt some psychological pressure to answer the agents' questions when he realized that they had tricked him."  *Id.* at 374.  Here, Dr. Misra contends that police sought to get Dr. Misra to answer questions by neglecting to inform her that she was a target of the investigation.  [R. 516 at 18.]  Even if true, police did not reveal their ruse during the interview.  [R. 476 at 45.]  Thus, by not "realiz[ing] that they had tricked" her, Dr. Misra could not feel "psychological pressure to answer questions" from the plan.  *Martinez*, 795 F. App'x at 374.  The length and manner of questioning continues to weigh against custody.

### 3

Dr. Misra's freedom of movement during the interview weighs against finding that she was in custody.  During the interview, Dr. Misra was not physically restrained, was not told that she could not move about the room, and was not forcibly isolated from the outside world.  *See Martinez*, 795 F. App'x at 376.  Certainly, as Dr. Misra argues, police leading Dr. Misra to a

different room not of her choosing and closing the door suggests a restraint on her freedom.  [R. 516 at 19.]  But testimony shows that Dr. Misra sat closest to the door and across the table from the agents.  [R. 418 at 111-12; R. 476 at 44.]  Toward the end of the interview, the agents asked Dr. Misra if she wanted to use the bathroom.  [R. 418 at 130.]  And the only time Dr. Misra asked to leave, the agents immediately gave her permission and she left.  [R. 476 at 52.]  In the end, this factor too weighs against custody.  *See Zabel*, 35 F.4th at 503 (holding that a suspect was not in custody when police ordered him to a new location for an interview and refused to allow him to use a restroom because he was not physically restrained and police said that he did not have to speak with them).

Dr. Misra argues that two other circumstances surrounding the interview demonstrate that police restrained her freedom of movement comparable to formal arrest.  [R. 516 at 19.]

First, Dr. Misra contends that the original police entry and security sweep before the interview contributed to a reasonable feeling that she was in custody.  She likens her interview to Ms. Barnett's.  *Id.*  Indeed, while the Court's inquiry is specifically focused on whether Dr. Misra was in custody during the interview itself, events that occur before an interview begins can impact whether a reasonable person would reasonably feel restrained during the interview itself. *See, e.g.*, *United States v. Barnett*, No. 6:21-cr-00013-GFVT-HAI-2, 2022 U.S. Dist. LEXIS 85544, at *20 (E.D. Ky. May 11, 2022).  Yet unlike in *Barnett*, the police presence here would not have had a lasting effect on her interview.  Dr. Misra's time in the waiting area was brief, just thirty to forty-five minutes compared to Ms. Barnett's five hours.  [R. 476 at 40.]  Further, the agents signaled a break between her time in the waiting area and the interview by asking Dr. Misra if she was "willing to talk" and telling her that she was "free to leave at any time."  [R. 495 at 3.]

Second, Dr. Misra argues that the agents asking her to not use her phone during the interview weighs in favor of custody.  Dr. Misra is correct that this demonstrates a restriction on her freedom of movement, and Judge Ingram agrees.  Judge Ingram determined that police restraining Dr. Misra's phone use by asking her to "hold off on that for just a second" when she asked to make a call and a few minutes later telling her to not "use your phone for just a second and we'll be right back" weighs somewhat in favor of custody.  [R. 495 at 23-24.]  But Dr. Misra objects to Judge Ingram limiting the weight of this factor because he "credited the subjective reasoning of the agents" for asking Dr. Misra to refrain from using her phone.  [R. 516 at 19.]  Instead, Dr. Misra suggests that the Court should balance the agents' reasoning against the agents' unspoken desire that clinic staff not leave and Dr. Misra's subjective belief that she was not free to leave. *Id.* at 19-21.  The Court's custody analysis relies on neither.  It focuses only on how "a reasonable person in the suspect's position would perceive his or her freedom to leave," rather than someone's actual mindset. *J.D.B.*, 131 S. Ct. at 2402.

At bottom, discouraging an interviewee from using their phone does restrain their freedom to a degree.  However, this slight imposition does not overcome the other evidence demonstrating that Dr. Misra retained her freedom of movement.  This factor weighs against custody.

**4**

The final *Hinojosa* consideration also weighs against a finding of custody.  "Whether the investigators inform a suspect that he is free to leave or to refuse to answer questions is the most important consideration in the *Miranda* custody analysis." *Martinez*, 795 Fed. App'x at 371.  When law enforcement officers provide clear assurances that a person "is free to leave or

terminate questioning, those assurances likely would guarantee the noncustodial nature of the interview." *Zabel*, 35 F.4th at 503.

Here, Agent Haines began the interview by telling Dr. Misra that he would like to talk to her if she is willing.  [R. 495 at 25.]  He then informed Dr. Misra that when executing search warrants, they "typically try to interview staff" and then asked: "Is it okay to talk to you to answer some questions? If you don't want to, you don't have to." *Id.*  After Dr. Misra responded, Agent Haines emphasized: "You are free to leave at any time." *Id.*  He then repeated that if she did not want to answer a question, she did not have to answer it. *Id.*  Dr. Misra does not contend that anything prevented her from hearing Agent Haines.  Thus, the Court agrees with Judge Ingram that, through this exchange, police provided clear assurances to Dr. Misra that she was "free to leave or terminate questioning." *Zabel*, 35 F.4th at 503.  This factor alone "likely would guarantee" finding that Dr. Misra was not in custody. *Id.*

When focusing on how a reasonable person would perceive her circumstances, each of the four factors demonstrates that police did not subject her to formal arrest or a restraint on her freedom of movement comparable to formal arrest. *See Panak*, 552 F.3d at 471.  Accordingly, Judge Ingram correctly determined that police did not violate the Fifth Amendment by not advising Dr. Misra of her *Miranda* rights.

**B**

Dr. Misra also objects to Judge Ingram's determination that her statements were voluntary.  Dr. Misra argues that her statements must be suppressed because her interview was coerced.  The Fifth Amendment protects against compelled self-incrimination, and the Due Process clause of the Fourteenth Amendment prohibits the use of coerced confessions at trial when the method of obtaining the confession was "so offensive to a civilized system of justice

that they must be condemned." *Miller*, 474 U.S. at 109.  The Government bears the burden of establishing that the statement was voluntary. *Id.* (citing *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992)).

The inquiry is ultimately one of the totality of the circumstances, asking whether the statement was "the product of free and rational choice rather than any police coercion." *Mahan*, 190 F.3d at 423 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988)).  Three factors guide this inquiry: whether "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." *Id.*  The suspect's age, education, and intelligence may affect these factors.  *Mahan*, 190 F.3d at 422-23.

Judge Ingram found that Dr. Misra's statements were not the product of undue coercion. [R. 495 at 30.]  He based this conclusion largely on the many factors weighing against custody, including that "[t]here was no physical oppression, and the interview was not extremely long." *Id.*  Judge Ingram also considered that Dr. Misra's age, education, and intelligence factored against coercion because she was 49 years old at the time of the interview and "is an educated and intelligent physician." *Id.*; *see Mahan*, 190 F.3d at 422-23.

Dr. Misra objects.  [R. 516 at 23.]  She too bases her argument largely on the same facts used for her custody analysis: law enforcement demonstrated a strong show of force when completing their security sweep of the EHC office, the agents interviewed her for over an hour and a half in a room of their choosing, and the agents asked Dr. Misra to not use her cell phone. *Id.* at 24.  Dr. Misra also points out that the agents never advised her of her *Miranda* rights.

While these facts may have a degree of coercive impact, they are insufficient to overcome Dr. Misra's will.  *See Mahan*, 190 F.3d at 422.  Other factors emphasize that Dr. Misra

14

was not coerced into making the statements. The agents offered her a break during the interview and kept a calm, friendly demeanor. But most importantly, she was told the interview was optional, and Dr. Misra chose to answer the agents' questions. There is no indication that she made this choice because of any coercive pressures. When Dr. Misra decided that she did not want to answer a question, she didn't; when Dr. Misra decided that she wanted to leave, she did. Therefore, the United States met its burden by establishing that Dr. Misra's statements were made voluntarily and without undue coercion.

### III

Upon a review of the totality of the circumstances in this matter, the Court finds that a reasonable person in Dr. Misra's place would have felt free to leave the interview. The Court further finds that her statements were voluntary and not the product of undue coercion. Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Dr. Misra's Objection **[R. 516]** is **OVERRULED**;

2. Judge Ingram's Recommended Disposition **[R. 495]** is **ADOPTED** as and for the Opinion of the Court; and,

3. Dr. Misra's Motion to Suppress **[R. 254]** is **DENIED**.


This the 12th day of December, 2022.

Gregory F. Van Tatenhove
United States District Judge

15